471 A.2d 1129

MONTGOMERY COUNTY, Maryland

v.

Edward W. SCHULTZE et al.

No. 562, Sept. Term, 1983.

Court of Special Appeals of Maryland.

March 6, 1984.

Certiorari Granted June 27, 1984.

782

784

Paul A. McGuckian, County Atty. for Montgomery County, with whom were Robert G. Tobin, Jr., Deputy County Atty. for Montgomery County, Nathan J. Greenbaum, Sr. Asst. County Atty. for Montgomery County and Stephen P. Elmendorf, Asst. County Atty. for Montgomery County on brief, for appellant.

Stephen Z. Kaufman and Kathleen Sheehy, Silver Spring, with whom were Linowes & Blocher, Silver Spring, on brief, for appellees.

Argued before MOYLAN, LOWE and GETTY, JJ.

LOWE, Judge.

In Montgomery County, no County road shall be constructed except pursuant to a written order of the county executive authorizing such construction. Mont.Co., Md., Code § 49–52. Before authorizing construction, the county executive must hold a public hearing, § 49–53(a), and may authorize the construction only if he finds "that the public interest requires that any road construction project under consideration ... be carried out ...." (§ 49–54(a)). Upon authorizing construction, he shall forward a report to the county council describing the work to be done stating "with

particularity, what portion of the cost of such construction is recommended to be borne by the adjacent properties and what portion, if any, of such cost is recommended to be borne by the county . . . ." § 49–54(b). That portion of the cost to be borne by the adjacent properties is to be computed on the basis of linear frontage of the properties. § 49–54(b). The proportionate cost of such construction is thus assessed by the county council "as a benefit to all property adjacent to the right-of-way of such road and specially benefited by the construction thereof . . ." (§ 49–52) to the extent that the Road Construction Code provides for the assessment of such cost. No costs may be assessed against property of the State or Federal Government, § 49–52(c), nor could allowable assessments exceed the amount by which the property is specially benefited by such construction. § 49–52(a) and (b).[1]

In this appeal the appellees question the validity of the special assessments which the appellant, the County Council of Montgomery County, imposed upon their property. Questions concerning these special assessments have been addressed in Maryland courts since their inception. Before the enactment of the Act of 1874, ch. 218, Baltimore City property owners were required to apply to the City Council for particular improvements (such as grading, curbing or reconstruction) of streets adjacent to their property, and the City Council could enact a special ordinance for each individual application if and when the construction was approved. *Burns v. Mayor etc. of Baltimore,* 48 Md. 198, 200 (1878). The consideration of these applications and the passage of these special ordinances apparently became so cumbersome that the procedure was changed by the Legislature. City owners who wanted their property benefited by such improvements could still apply to the City Council but the Legislature authorized the Mayor and Council of Baltimore to provide a standard for the application and incident pro-

---

1. Driveways, etc., are assessed to their adjoining properties. § 49–52(a).

ceedings (including the assessment of the costs, in whole or in part, upon the adjacent property) to be established in a single ordinance applicable to all future cases. The legislative authority also gave "the Mayor and City Council power to pass ordinances in special cases . . . without any application by property owners." *Id.* at 201–202. The question arose whether

"... this law grant[ed] to the City authorities power to make improvements of this character for the public *convenience generally,* or for the *benefit of the whole City* without any motive or purpose of special benefit to property in the immediate locality, and to assess the cost of the work upon the owners of such property? If it does, then the grave question is presented, whether such an enactment would be within the scope of legislative power. . . . For assuming the power to exist, it would be . . . oppressive and unjust to exert it . . . ." *Id.* at 202.

Justifying special assessments when the property owners received a special benefit from such "public" improvements, the Court of Appeals found that these "special benefit" assessments were proper since "the improvement is for their benefit, and that they derive such advantage from it, in the enhanced value of their property over and above what is conferred upon the public at large, that it is just they should be specially assessed therefor, and on this ground the validity of such laws has been sustained by the Courts." *Burns, supra* at 203. Ordinances authorizing a particular improvement are presumed to be for the benefit of those particular properties directly affected unless the ordinance declares the project expressly to be for the general benefit of the public at large. *Mayor etc. of Balt. and Webb v. Johns Hopkins Hospital, et al.,* 56 Md. 1, 27 (1881). See also *V.F.W. v. Montgomery County,* 207 Md. 442, 452, 115 A.2d 249 (1955). If the presence of a purpose to benefit the public in general is manifest in an ordinance imposing a special benefit tax, the usual presumption would not arise and special assessments on particular properties would be invalid. *Burns, supra* at 204–205; *Mayor etc. of Balt. v.*

*Moore, et al.,* 6 H. & J. 375, 380–383 (1825); *Mayor etc. of Balt. v. Hughes,* 1 G. & J. 480, 492–493 (1829); see *V.F.W., supra.*

█ Since there must be both a public purpose to justify construction and a special benefit to the assessed property—above that accruing to the public—to warrant the special assessment, *V.F.W., supra* 207 Md. at 448, 115 A.2d 249, a more difficult problem arises as to when the abutting bene-fited properties may be compelled to carry the entire con-struction cost. That question appears to have been answer-ed sub silentio if without equivocation in cases where the improvement is an obvious and direct peculiar benefit to the property it abuts, such as water and sewer mains which due to proximity may be tapped for private use so the owner does not need to provide lines or be denied access altogether. The public is benefited by the abutting property's access to water and sewer lines only by its interest in the general health and safety which serves as the justification for the public effort and expenditure in those local improvements. A similar disproportionate special benefit is readily apparent in sidewalk improvements for local or commercial pedestri-ans where the costs appear to have been assessed totally against abutting properties. See, *e.g., Bassett v. M. & C. of Ocean City,* 118 Md. 114, 84 A. 262 (1912); see also *Hyatts-ville v. Smith,* 105 Md. 318, 325, 66 A. 44 (1907).

In most of the cases wherein the improvement anticipated is a road or way, the rigid rule that

"... the settled law in this State that the cost of the improvement of a street may be assessed, *in whole or in part,* upon the property binding on the street" (emphasis added),

points to the justification for such special assessments, on the basis that the improvements must have been made with the primary intent to benefit specially the properties in a particular district or on the abutting avenue. *Bassett, supra* 118 Md. at 119, 84 A. 262. That is made abundantly clear by *Burns, supra* at 204, where the Court explained that

"... an ordinance providing for a special case of paving or repaving a street or any part of a street, without the application of the property owners, and assessing the cost, in whole or in part, on the adjacent property, *must be passed with the motive and for the purpose of conferring a special benefit upon such property,* or else it is nugatory and void." (Emphasis added).

In none of the older cases was the issue of apportioning the benefits between the public and the private adjacent owners for the purpose of paying for the improvement directly before the Court. In fact the formula for justifying any special assessment was frequently reiterated from *Burns, supra,* in that the adjacent properties derived such advantage from the improvement in the enhanced value of their property "*over and above what is conferred upon the public at large,* that it is just that they should be especially assessed therefor, and on this ground the validity of such laws has been sustained." *Hyattsville, supra* 105 Md. at 323, 66 A. 44 (emphasis partially added). It does seem clear, however, that where the costs have been apportioned between general tax funds and assessments of abutting properties, even if by all appearances disproportionately so, the Court of Appeals considers any such apportionment an exercise of legislative discretion which will not warrant the holding of the assessment illegal. *V.F.W., supra* 207 Md. at 453, 115 A.2d 249. In that case, however, the Court of Appeals was quite concerned that the primary purpose of the roadway improvement was expressly for the primary benefit of a school yet the abutting property was assessed 80% of the cost. The holding in *V.F.W., supra,* does not foreclose some form of judicial review; to the contrary, it suggests significant concern with the problem of allocating costs between the general tax funds and the abutting properties.

In seeking guidance on the basic question before us of whether abutting property owners may be compelled to pay the entire costs of a public highway, not only do we find vacillation among the cases but within them as well. In

*Alexander v. M. etc. City of Balt.,* 5 Gill 383, 396 (1847), as the Court of Appeals rationalized its observation that a special benefit assessment imposed no burden upon the persons upon whom it operates, by its reference to a "ratio", the Court presupposed sub silentio what *V.F.W.* later suggested in its dictum, that there should be public-private benefit considerations.

"It is a mere requisition, that the owners of property, the value of which is enhanced by the opening of the street, shall pay for the improvement in a ratio to the benefit derived from it."

The Court then suggested that if the balance is extravagantly disproportionate, justice may be sought in the courts.

"It cannot be denied that injustice is sometimes inflicted in the application of this principle, by an extravagant estimate of the benefits conferred by the improvements: but when this occurs, the aggrieved party may appeal to the City Court, and contest the correctness of the assessment made by the commissioners before a jury of the country [sic]."

Reflecting upon one of the equitable safeguards which also appears in the County statute here, that "[t]he law does not . . . require any man to pay more than his benefits shall be valued at" (*id.* at 390, quoting Chief Judge Archer from an earlier opinion of March, 1847), the Court went on to say:

"And, assuming that the amount of the assessment is only equivalent to the benefit derived by the owner from the enhanced value of his property, nothing can be more equitable and just than that he should pay it." *Id.* at 396.

■ This is a far cry from holding, as the County interprets here, that any public improvement regardless of its primary purpose and anticipated use may be assessed in its entirety to adjacent private property owners simply by declaring that the adjacent property is enhanced in an amount equal to the cost of the project without reference to some apportionment of the costs to the general public. If a general public benefit is the *only* result of the improvement

the entire betterment assessment can be invalidated. *Hyattsville, supra* 105 Md. at 325, 66 A. 44. It would logically follow that where the primary purpose of the improvement is not to confer a special benefit upon the adjacent property, as a requisite suggested in *Burns* and *Bassett, supra,* the predominate general benefit and public purpose for the improvement must be a predicate consideration in determining whether and what the special benefit assessable to each abutting property is to be.

In the case before us, the Montgomery County Executive publicized and held a public hearing on October 2, 1975, as required by the Code, to consider the construction of "Randolph Road between Rockville Pike and Parklawn Drive . . . ." The purpose of the construction was to enhance Randolph Road's function as a major cross-county connector replacing the need for the proposed Rockville Freeway. In fact, the project was introduced initially due to the delay and uncertainty of the proposed Rockville Freeway.

Notices were properly given, including estimated costs and assessments but neither of the appellees (cross-appellants) Schultze or Berk appeared or participated in the hearing. Passing over (for the moment) details extraneous to the direct appeal, the record shows that the County Executive, still following the Code requirements, by an executive order dated February 3, 1976, expressly found "that public interest require[d] improvement" of the Randolph Road project.

The cost of the construction, according to § 49–52 of the Code, as noted, was to be assessed by resolution of the county council, "as a benefit to all property adjacent to the right-of-way of such road and specially benefited by the construction thereof . . . ." This resolution was necessary to subject the abutting property owners to a special assessment. "How much" was a legislative question based upon the Executive's recommendation subject to certain statutory protections against excessive or prohibitory assessments. Two of these statutes provided benchmarks beyond which an abutting property owner could not be assessed.

Sec. 49–52(a) provided that the "cost of construction should be assessed only to the extent that any Road Construction Code of the county in force at the time construction is authorized provides for the assessment of such cost or any portion thereof". At the time of the hearing the Road Construction Code differentiated the percentage of special benefit assessment cost depending upon the type of road. It provided the extent of assessment for the type of road in question as two-thirds of the costs of paving and not to include land acquisition costs.[2] Mont.Co., Md., Code (1971, as

---

**2.**    "(b) Whenever a road is constructed as a 'front foot assessment' project pursuant to sections 49–51 to 49–61 the portion of the cost chargeable and assessed to the benefited abutting properties shall be as follows:

(1) In the case of the reconstruction and rebuilding of a road which has been accepted for maintenance or is being maintained by the county:

a. *For a business district road—the cost of curbs and gutters, sidewalks, returns of curbs, sidewalk and driveway entrances and two-thirds of the cost of paving.*

b.   For an arterial road within the suburban district or where it passes through or abuts a subdivision, a primary or secondary residential road, an alley or a service drive—the cost of curbs and gutters, sidewalks, returns of curbs, sidewalk and driveway entrances, and two-thirds of the cost of the paving; provided, that where a road is of greater width than twenty-six feet, two-thirds of the cost of paving a twenty-six foot road shall be the paving cost chargeable to the abutting owners.

(2) In the case of any road which has not previously been accepted for maintenance or is not being maintained by the county, the cost shall include:

a.   For a business district road—the cost of grading, drainage structures, paving, curbs and gutters, sidewalks, returns of curbs and sidewalk and driveway entrances.

b.   For an arterial road outside the limits of the suburban district where it does not pass through or abut a subdivision—none. In the case of any such road lying within the limits of the suburban district or where it passes through or abuts a subdivision, the cost of grading, drainage structures and paving. Where curbs and gutters, sidewalks, returns of curbs and sidewalk and driveway entrances are required, the cost of same shall be included.

c.   In the case of a rural road—none.

d.   In the case of a primary residential road—the cost of grading, drainage structures, curbs and gutters, sidewalks returns of curbs, sidewalk and driveway entrances and paving.

amended) § 49–27(b) and (c). Since road construction is justified only if there is some public benefit, the assessable public benefit exceeding that special benefit was presumably treated as at least one-third of the total construction cost by virtue of the statutory limit. It appears that the Court of Appeals in *V.F.W., supra,* viewed this section as an attempt to deal with the problems of apportioning the costs between the public and private interests.[3]

There is a further protection in § 49–52(b).

"No such property shall be assessed in excess of the amount by which such property is specially benefited by such construction; . . . ."

---

e. In the case of a secondary residential road—the cost of grading, drainage structures, paving, curbs and gutters, sidewalks, returns of curbs, and where required, sidewalk and driveway entrances.

f. In the case of an alley—the cost of grading, drainage structures and paving.

g. In the case of a service drive or marginal access road—the cost of grading, drainage structures, paving, curbs and gutters, sidewalks, returns of curbs and sidewalk and driveway entrances.

h. In the case of a dual lane road, the cost shall be charged to the abutting property in the same manner as prescribed in this section for business district, arterial, primary or secondary residential roads according to the particular classification of the dual lane road.

(c) Except as provided in this article, all other costs shall be borne by the county." (Emphasis added).

**3.** A footnote to Sec. 49–37, Montgomery County Code 1972 (1977 Replacement Volume as amended) reads as follows:

"The law is firmly established in Maryland that, in order to justify a special assessment for a local improvement such as the paving of a street there must be both a public purpose and a special benefit to the properties to be assessed, over and above that accruing to the public. The difficulty of balancing the necessary public interest and the required special benefits to particular properties has often led to imposing a part of the cost on the community at large through general taxation and a part on properties specially benefited. This section undertakes to deal with the problem by providing for different bases for allocating costs in whole or in part against abutting properties on the one hand and general tax funds on the other. *Silver Springs Memorial Post, V.F.W. v. Montgomery County,* 207 Md. 442, 115 A.2d 249 (1955)."

This protection which limited the assessment to the enhancement had an added statutory significance as a consequence of the two-third cost limitation. Not only would there be a statutory guarantee of at least one-third public participation but a property owner whose use was not enhanced or only slightly benefited had the protection accorded by subsection (b), *i.e.,* limiting his special assessment to the special value the road had for his property.

The executive order authorizing the Randolph Road construction project was not issued, however, until February 3, 1976. In the interim between the hearing and the authorization, the County Council on January 14, 1976, amended § 49–37(b) by eliminating the road type distinctions of construction, rebuilding, etc., and abolished the two-thirds limitation in the Code provision. Its substituted version was simplicity itself, providing that:

"Whenever a road is constructed as a 'front foot assessment' project, pursuant to sections 49–51 to 49–61, the portion of the cost chargeable and assessed to the benefited abutting properties shall be all costs of construction, including costs of acquisition of land or interest therein for right-of-way." § 49–37(b).

After the reconstruction (or construction) of Randolph Road from a residential type road to a substitute freeway was completed, the County Executive's assessments of the abutting owners were presented to the County Council which substantially adopted the recommendations. Appellees (cross appellants) Schultze and Berk filed an administrative appeal to the Circuit Court for Montgomery County. Judge Rosalyn B. Bell held, among other things, that despite the record reflecting a public need for the project as declared by the County Executive and a concomitant public benefit from it, the nearly sixty percent costs absorbed by the county

"supposedly to reflect a public benefit were primarily a by-product of other factors. The principal factor was an inability by law [§ 49–52(c)] to collect the assessments on abutting property owned by the State of Maryland.

Appellants argue that the total cost of the Project was assessed against all abutting property owners. The State of Maryland was included as an abutting property owner. The County paid the cost of the special front-foot benefit assessed against the State property in addition to the costs associated with the B & O Railroad Property. This amount was apparently included in the County figures to arrive at a determination that the County paid 60% of the cost of the project. While this may be accurate, it does not reflect, and in examining the record, the Court cannot find any determination of an amount attributable to a public benefit."

Judge Bell then remanded the case "to the Montgomery County Council to determine the cost attributable to the public benefit and adjust the front-foot benefit assessment accordingly." The County seems most concerned that:

"By ordering the Montgomery County Council to determine what construction costs were attributable to public benefit and to reduce the special benefit assessments accordingly, the lower court, in effect, judicially repealed the County Council's amendments to Sections 49–37 and 49–52. The lower court concluded, in effect, that because there was a public need for a road construction project, the total cost of construction could never be fully assessed as special benefit assessments against the abutting property owners, even when those special benefit assessments did not exceed the amount of special benefits accruing to the abutting properties."

The County misreads the effect of Judge Bell's decision. Commendably, she did not declare these statutes to be invalid. The statute, if properly administered is not invalid, but there must be some apportionment of the total costs to the public whose interest is in this case the primary consideration for the construction. None of the evidence in this case permitted so much as an inference that the costs were allocated or that apportioning the costs was ever considered.

■ From our reading of the cases we conclude that underlying all of the Court of Appeals' opinions from which the parties have extracted quotations, as well as those we have unearthed, is the presupposition that the enhanced benefit of a project by reason of proximity alone is not sufficient to require the more proximate taxpayers to shoulder the entire cost of a project purposed generally to be beneficial to, and primarily used by, the public at large. That may be permissible when the *purpose* of the improvement is to confer a special benefit on the adjacent properties, *Burns, supra.* If the statute does not allow for some division of costs to reflect general public participation where the improvement is more clearly for the public (rather than a particular district or the adjacent property owners), the record must reflect that public cost participation was contemplated and to some degree apportioned by the council when a want of any apportionment is judicially raised.

■ In *Mayor, etc. of Balt. v. Moore, supra* at 380–381, Chief Judge Buchanan in 1825 noted that:

"Where a street is directed to be paved for the benefit of a particular part or district of the city, it is perhaps proper that such part or district be taxed for the purpose; but where the paving is for the general benefit [as was declared in the preamble of the ordinance in question], and not of the immediate district in which the street lies, it ought to be paid for out of the general fund; and there would be much injustice in imposing a special tax on the particular district for that object, which could not have been the intention of the Legislature."

Judge Miller, who also wrote the *Burns* opinion, made it eminently clear that the power to determine: 1) when a special assessment shall be made, 2) on what basis it shall be apportioned, 3) over what area it shall extend, and 4) whether the particular improvement will confer a benefit upon property in the immediate locality beyond that which will accrue therefrom to property more remote, or to the public generally, is a power confined to the legislative department,

to be exercised, subject to such provisions, and under such restrictions only as the lawmakers may see fit, in each case to prescribe. *Mayor, etc. of Balt. and Webb v. Johns Hopkins Hospital, et al., supra.* Therefore, explained Judge Miller, unless there is something on the face of the ordinance authorizing the improvement, indicating that those who passed it judged that the improvement was for the public convenience "exclusively" and not for the benefit of the particular district, the *validity* of the ordinance cannot be assailed in court upon the ground that the improvement was in fact for the benefit of the public at large, and conferred no special benefit upon the owner of adjacent property. *Id.* at 28. See also *Hyattsville v. Smith, supra.*

But Judge Miller refused to close the door completely, suggesting that although the statute's *validity* in such a case was unassailable, judicial remedies for extreme circumstances of disparate assessments, vis-a-vis benefit were not foreclosed. As suggested later by *V.F.W., supra,* he cautioned that:

> "We do not mean to say a case may not arise of such abuse of this power by the legislative body, as to make it 'the duty of the Court to protect the citizen from robbery under color of a better name,' but it must be a clear case of such abuse, to justify the interference of the Court . . . ." *Id.* at 28–29.

What then constitutes "a clear case of such abuse, to justify the interference of the Court . . ."?

In *V.F.W., supra,* the Court noted the "more serious problem" suggested by a disproportionate cost of an improvement on abutting owners in light of the "principal" public reason for paving the street. Significantly, however, it pointed out that whatever the limited costs were that the County absorbed (there approximately 20%), they represented items or amounts which were not otherwise assessable against abutting properties. *Id.* 207 Md. at 451, 115 A.2d 249.

In the case before us, Judge Bell found factually from the record that the only suggestion of what the 60% of the construction cost paid by the County represented, was the absorption of those abutting owners' assessments which it could not legally collect, *e.g.*, property owned by the B. and O. Railroad or the State. There was *no* evidence that the County's contribution on behalf of the general public constituted any amount apportioned to the public use or benefit.

Prior to the 1976 amendment, that observation may not have been valid because the statute on its face left a substantial percentage (33⅓%) of the construction costs to be paid out of public coffers, as well as costs of land acquisition. Courts cannot question the amount absent injustice caused by extravagant estimates of special benefits conferred. *Alexander, supra* at 396. For improvements other than those purposed to confer special benefits, the fact of some just apportionment of cost precludes any further judicial inquiry or interference. *V.F.W., supra* 207 Md. at 452–453, 115 A.2d 249. The County statute, § 49–37(b) as amended in 1976, however, negates a statutory inference of any apportionment between public general funds and specially benefited adjacent property assessments.

"[T]he portion of the cost chargeable and assessed to the benefited abutting properties shall be *all* costs of construction, including costs of acquisition of land or interest therein, for right-of-way." (Emphasis added).

Because the older cases we have discussed, repeatedly stated that improvements passed with the motive and for the purpose of conferring a special benefit upon such property may be assessed, "in whole or in part", upon the property binding on the street, the amended Montgomery County statute is not necessarily invalid on its face. Even when, as here, the road is proclaimed to fulfill the public interest as a requisite to construction, Mont.Co., Md., Code § 49–54(a), or as necessary or beneficial to the general public as opposed to reflecting a purpose to confer a special benefit on adjacent property, the application of the statute can avoid that "clear case of abuse" justifying judicial interference. *Johns Hop-*

*kins, supra* at 28–29. But if the county condemns property owners' lands because the public interest requires an improvement through them, and assumes that § 49–37(b) means that the total cost of the project is mandatorily chargeable on a front foot basis to such property owners adjacent to the improvement, theoretically the landowners could be assessed an amount equal to their condemnation awards plus the costs of construction of the "improvement". The protection provided in § 49–52(b), limiting the assessment to the value of the benefit to the properties, is of no help because the "special benefit" to the property has been tied to and predetermined by the cost of the road. The statute's further provision in § 49–37(c) that "[a]ll costs in excess of the special benefit to the abutting property or otherwise waived in [the] article shall be borne by the county" is equally meaningless; since *all* costs would be assessed to the abutting property, there could be no costs in excess of the predetermined special benefit. Both sections become meaningless by virtue of the 1976 amendment under this interpretation. There would be nothing left to do but to divide the costs among the adjacent property owners which by statute is done simply on a front foot basis.

This improper predicate is what has led in the case before us to the obvious inequity of having a few adjacent property owners pay for a substitute freeway or county traffic corridor. The County Council based its assessment on the recommendations of the County Executive who adopted the county appraiser's determination of the special benefit to the adjacent properties. The appraiser's report shows that his apportionment of costs was based upon an arbitrary, unfounded and improper interpretation of the statutes.

He began by stating his premise that:

"According to Sec. 49–37(a) of the Montgomery County Code, no road shall be constructed by the County unless the cost of the road is to be charged against the benefitted property. Sec. 49–37(b) states that whenever a road is

constructed as a 'front foot assessment', the portion of the cost chargeable and assessed to the benefitted abutting properties shall be all costs of construction, including costs of acquisition of land, or interest therein, for right of way. Sec. 49–52(b) provides that no property shall be assessed in excess of the amount by which such property is specially benefitted by such construction. Property owned by the United States, the State or any governmental agency is exempted from assessment by Sec. 49–52(a) [sic]."

To justify his conclusion that the costs of construction are concomitant with the special benefit to the adjacent properties he rationalized that:

"The premise under which front-foot benefits are estimated is that the increase in value to the property is equal to the cost that would accrue to a developer who built an industrial subdivision in which he would be required to dedicate land for streets and sidewalks, and then build them to County standards. This former section of Randolph Road has existed as an original residential street for a long time and according to Department of Transportation records has never been assessed to the adjoining property owners. Thus, the total cost of the project, except the cost of the railroad crossing and other minor costs, are chargeable to the abutting property owners."

Although the appraiser recited the protection intended to be afforded by § 49–52(b)—that no property shall be assessed in excess of the amount by which such property is specially benefited as a result of such construction—by proclaiming that *all* costs shall be assessed to the abutting property, he has implicitly mandated what constitutes the total special benefits which he thought were mandated as being the total amount of the assessment. The "special benefit" in the appraiser's mind has by fiat become the cost of the project which eliminates the necessity of determining the real value of the improvement to the property abutting, beyond its benefit to the public generally. His interpretation of §§ 49–37(a)[4] and (b) leaves § 49–52(c) without any

---

4. Sec. 49–37(a) reads as follows:

meaning. Such an absurd intention we may not attribute to a legislative body. *State v. Fabritz,* 276 Md. 416, 422, 348 A.2d 275 (1975). As concluded by the trial judge, the appraiser's intention to assess these properties the entire cost of the project was carried out, passed on to the County Executive and adopted by the County Council. It is the Council's unquestioning adoption of the result of the appraiser's improper statutory interpretation that caused the error Judge Bell perceived.

The abutting properties owned by the State or government agencies, as well as the B. & O. Railroad, were declared not assessable, thus leaving their allocated portions to be picked up by the County as well as the surplus left after certain equitable allocations for odd-shaped properties. A careful review of the record clearly shows that all of the public funds expended were in substitution for properties upon which the assessment was apportioned but uncollectible, or for which the County was reimbursed.[5]

It followed therefore that nineteen "specially benefited" property owners were assessed whatever was necessary to provide a road, the existence of which is necessarily justified by general public interest, need and convenience as well as being considered an extension of a cross county thorough-

---

"No road shall be constructed by the county, whether on force account or by contract or both, unless the right-of-way for such road has been previously acquired by the county or dedicated to public use by appropriate recording among the land records of the county, and the cost of the road is to be charged against the benefited property in accordance with sections 49–51 to 49–61 and subsection (b) of this section. Any road so constructed shall conform to the minimum requirements, standards and specifications for its particular classification as prescribed by this article; provided, that the county may require such construction to be in excess of or better than that prescribed as a minimum; provided further, that nothing herein shall prohibit the county from constructing roads pursuant to section 20–42 relating to contract services for municipalities or pursuant to agreements made by the county with other governmental agencies."

5. It appears that a "County Work Force" item of $17,739.23 was not included by the appraiser as part of the construction cost.

fare.  That arbitrary assessment seems to be a "clear case of
. . . abuse" addressed by Judge Miller in *Johns Hopkins
Hospital, supra* at 28, which he suggested is shown by
"a local assessment . . . so far transcend[ing] the limits of
equality and reason, that its execution would cease to be a
tax, or contribution to a common burden, and become
extortion and confiscation."

When reading these somewhat misleading statutes in *pari
materia* as we are admonished to do, *Smith v. Higinbothom,*
187 Md. 115, 131–132, 48 A.2d 754 (1946), we find that the
appraiser, the County Executive who relied upon him and
the County Council that passed the assessment, extracted
out of context a meaning unintended by the county council
when it passed the 1976 amendment.  When the appraiser
read in § 49–37(a) that "no road shall be constructed by the
county . . . [unless] the cost of the road is to be charged
against the benefitted property", he failed to consider what
was meant by the succeeding language "in accordance with
sections 49–51 to 49–61 and subsection (b) of this section."
He further failed to give any meaning to the limitation
imposed on subsection (b) that the costs chargeable to the
benefited abutting properties were not intended necessarily
to be all costs of construction.  Rather "the portion of the
costs chargeable" which formerly had been limited to ⅔ of
the costs of construction, now no longer so limited, might
include *all* costs of construction.  While the latter section's
protection is more limited than before, it still serves to
protect.  If the front foot apportioned value of the benefit
exceeds the comparably apportioned share of the costs of
construction, etc., the assessment is reduced by the excess.
But even with the increased exposure the section is still
intended as a cap not a mandated starting point.

Recognizing that the special benefit assessment provisions were not invalid if properly administered, the trial
judge commendably did not so declare them.  Rather she
remanded the case to the County Council for reapplication of
its statutes.  Alas, she faltered, however, in suggesting how

to do so. The judge suggested that the Council determine the cost attributable to the public benefit and adjust the front foot assessment accordingly. Would that there were conceivable a means of initially determining quantitatively or proportionately the public benefit; the balance of the special benefit to the properties would be easily and properly distributed on a front foot basis. See *Bassett, supra.* But that is beyond our ken. We can conceive of an appraiser estimating what, if any, benefit an upgrading of the residential Randolph Road to a four lane thoroughfare would be to the light industrial uses of the properties appurtenant, simply (though not necessarily) by a before and after appraisal. But a public benefit is too great an abstraction to quantify initially.

By determining the private benefit first, however, then applying it to the costs of construction, the statutory formula can be applied and still give meaning to all related sections. Such benefits apportioned on a front foot basis (§ 49–55) could be all of (rather than two-thirds of) the construction costs (including the costs of land acquisition), § 49–37(b), but in no case could the assessment to any property exceed the value by which the property is actually specially benefited by the construction. § 49–52(b). The balance of the road construction cost, if any, would be paid by the County. That procedure gives renewed meaning to § 49–37(c) that:

> "All costs in excess of the special benefit to the abutting property or otherwise waived in this article shall be borne by the county."

While this section was without purpose under the County's interpretation of the amended bill, by determining the benefit and applying it to the cost, rather than determining the costs to be the benefit, there may indeed be other costs for the County to bear.

The apportioning of the assessment among those specially benefited properties (which simplified is construction cost divided by total linear frontage times individual frontage) is a legislative plan that is neither indefinite nor unjust, *Bas-*

*sett, supra,* and as such may not be reviewed in the absence of fraud or mistake. *Leonardo v. County Comm.,* 214 Md. 287, 307, 134 A.2d 284 (1957). See also *Harlan v. Bel Air,* 178 Md. 260, 267–268, 13 A.2d 370 (1940). The "mistake", however, was not in the formula *distributing* the assessment; it was in the determination of the sum of the special benefits by the arbitrary application of a single standard benefit predicated upon an irrelevant factor.

The right that has evolved for government to apportion the costs of highways more to those specially benefited than to the public generally did not contemplate that a dominant public use would be totally subsidized by the private benefactor. The statute that requires that all construction costs, including land acquisition, be assessed to the abutting property can only be valid to the extent that it means what it says: "the portion of the cost" attributable to the abutting owner, implicitly beyond that which is generally beneficial to—and to be paid for by—the public.

■ In regard to cross appellants' complaints of denial of procedural due process, suffice to say we agree with Judge Bell and see no such denial. But if we were to hold that Judge Bell was wrong in remanding for a reevaluation, we would also have to hold that she was wrong in determining that appellees-cross appellants received constitutional due process. The statute cannot constitutionally stand if it is interpreted to permit government to provide a way for the public convenience at the total expense of a proximate few. *Cf. Mayor v. Moore, supra; Burns, supra; Johns Hopkins Hospital, supra; V.F.W., supra.* We also agree with Judge Bell that the tax assessment process in its totality as described is a legislative function carrying the imprimatur of validity and constitutionality; but that is only so if Judge Bell's interpretation that the prerequisite of a finding of public interest initiating construction authority presupposes some apportionment of public funding to the extent of that interest, unless the dominant purpose of bestowing a special benefit is clear. Only beyond that may "the *portion* of the

cost" attributable to the abutting owners include *all* costs of construction, including acquisition of land, not to exceed the amount by which the property is specially benefited.

In affirming Judge Bell's judgment, we note that she has directed the Council on remand

"to determine the cost attributable to the public benefit and adjust the front-foot benefit assessment accordingly."

This does not necessarily mean that the public benefit must be first determined. As we have pointed out the more practical procedure is to determine the real special benefit to appellees' properties rather than the arbitrary benefit predicated upon their devisable share of the overall cost. How the public benefit-special benefit apportionment ratio is derived is a legislative matter. That it is done is our only judicial concern.

We will not assess all of the costs of this appeal and cross-appeal to appellants, despite the extent of our preoccupation with the issues resulting in sustaining the validity of the County's statute—a result which we might well proclaim as a special benefit to the County. We will more equitably assess the costs generally benefiting the County to it and those specially benefiting appellees-cross appellants to them.

JUDGMENT AFFIRMED. COSTS OF APPEAL TO BE PAID BY APPELLANT. COSTS OF CROSS–APPEAL TO BE PAID BY CROSS-APPELLANTS.